24911. MONTGOMERY v. THE STATE.

SUBMITTED NOVEMBER 13, 1968—DECIDED DECEMBER 5, 1968.

*Henritze & Smith, Walter M. Henritze, Jr.,* for appellant.

*Richard Bell, Solicitor General, Hardaway Young, III, Arthur K. Bolton, Attorney General, Marion O. Gordon, Assistant Attorney General, William R. Childers, Jr., Deputy Assistant Attorney General,* for appellee.

MOBLEY, Justice. Ralph Kenneth Montgomery was convicted of the murder of John Henry Wilder and sentenced to life imprisonment. He filed a motion for new trial on the general grounds, and his appeal is from the denial of his motion for

new trial. It is his contention that the verdict was not supported by the evidence because the State's main witness was impeached, and because he proved alibi.

■ It is strongly urged that the only witness for the State who testified that she saw the homicide had sworn "wilfully and knowingly falsely," and that her testimony must be "disregarded entirely, unless corroborated by circumstances or other unimpeached evidence." *Code* § 38-1806.

This young woman testified on the trial that: The defendant had rented an apartment for her and had lived with her for several months, but had not been living with her for a few months prior to the homicide. She spent the evening preceding the homicide, Friday, December 1, with the deceased, going to a theater with him, making other stops, and then returning to her apartment where they engaged in amorous activities for some time. The defendant had the only key to her apartment, and he came into the apartment later and discovered her and the deceased in bed, unclothed. He had a gun in his hand. He grabbed the deceased by the arm and threw him up against the wall, then ordered them to get dressed, picked her baby up out of his bed, and told them to go out to the car of the deceased. The defendant got in the back seat with the baby, and the witness and the deceased were in the front seat, with the deceased driving. The defendant directed them to an isolated area, where the deceased stopped the car, and the defendant ordered them to get out of the car. Conversation ensued in which he berated and cursed the witness. When the deceased told the defendant that they were not going to listen to that kind of talk, and took the witness' arm and turned to walk away, the defendant shot the deceased, who fell to the ground. The witness cried and turned around to the defendant, who hit her and knocked her into some briars. The defendant then turned the deceased over, searched through his pockets, and shot some more. The defendant forced the witness to leave the scene and get back into the car of the deceased. The defendant drove her back to her apartment, and as soon as she had put her baby down, the defendant put the gun in her hand and told her to shoot herself. She let the gun fall, and the defendant picked it up and put it

in his pocket. She saw the defendant take the billfold of the deceased out of his pocket, take the money out of it and put the money in another pocket, and then put the billfold back. He then threw the keys to the car of the deceased to her and told her "to stay right there in my apartment and keep my damn mouth shut," and left. Later that morning she drove the car of the deceased to her mother's home in Macon. She intended to tell her mother what had happened, but she was too scared to tell her. She came back about 1 or 2 o'clock Monday morning, and called the defendant and asked him to tell her what to do and he said that he would see her that morning. He came to her apartment and told her to follow him over to his sister's house, that he wanted to get the tools of the deceased out of the car. That night the defendant came to her apartment with Horace McDonald, and told her that they were leaving to go to Florida to go to work for somebody he had known. She asked him what she was supposed to do, and he said she had better wipe the car clean and park it somewhere, and she followed his instructions. She moved into another apartment, stayed there a few days, and then went to her mother's home in Macon. Two detectives came to Macon to talk with her. She did not tell them the whole truth when they first talked with her. She told them that the defendant and Horace McDonald were present when the deceased was killed and that she was not. The reason she told them this was that she was scared and she did not want the defendant to know that she had told.

The defendant introduced the affidavit of this witness dated December 9, for the purpose of impeachment. In this affidavit she swore that: When she and the deceased came out of a beer place, the defendant and Horace McDonald were standing by the car of the deceased. They forced her and the deceased to get in the car, and Horace McDonald drove the car to the place of the homicide, with the defendant following on his motorcycle. The defendant told the deceased to get out, that they had something to talk about. They walked into the woods, and were in there for approximately 10 to 15 minutes. She heard a shot, and the defendant and Horace McDonald returned to the car.

Undoubtedly, this witness swore falsely either in her affidavit or in her testimony on the trial. However, on the question of the wilfulness of her false swearing she was entitled to explain her reasons for doing so, and the jury could consider this explanation in passing on her credibility. *Hunter v. State,* 43 Ga. 483 (2); *Williams v. State,* 69 Ga. 11 (20, 21, 22b, 28); *Campbell v. State,* 157 Ga. 233 (2) (121 SE 306); *Bivins v. State,* 200 Ga. 729 (8), 740 (38 SE2d 273). The jury could have believed her explanation that she gave a false account of the homicide because she was afraid of the defendant and did not want him to know that she was the one who had told of his participation in it.

Furthermore, her testimony was corroborated on several material points by the testimony of Horace McDonald and by circumstances shown by other evidence. Horace McDonald testified that he was with the defendant on Monday, December 4. He stated that: He saw the defendant at the home of the defendant's sister, and the defendant exhibited a pistol and a wallet to him. While they were on a trip in which the defendant was attempting to sell tools (identified by other evidence as the tools of the deceased), the defendant gave him a wallet, telling him to remove any identifying papers in it. The defendant took him to a place where the body of the deceased was found, and the defendant thereafter called the police and notified them that the body was there, fabricating a story that they were taking an old mattress out there and found the deceased.

This witness stated that the defendant accounted for his possession of the tools of the deceased by stating that the young woman who came to his sister's home (the State's main witness) wanted him to sell them for her, and stated that the defendant told him that the woman said she shot a man. The jury could have discredited the defendant's assertion to this witness that his knowledge of the place where the body would be found and possession of the wallet and tools of the deceased were obtained from the young woman, and could have considered this testimony and other circumstantial evidence as corroborating the testimony of the young woman. Thus there is no merit in the contention that the evidence was insufficient to support the ver-

dict because the testimony of the main witness should be disregarded entirely.

■ The defendant introduced a number of witnesses in an attempt to prove alibi. These witnesses testified that the defendant was attending the wedding of his sister and a party thereafter at the home of his parents on the evening of December 1 and the early morning of December 2, the witnesses testifying that the defendant did not leave there until about 3:30 or 4 o'clock in the morning, and the defendant's wife testified that he went home with her after the party and did not leave until 11 o'clock that morning. The State's main witness testified that she did not know the time the homicide occurred, but her testimony as to the events that transpired prior to it indicates that it was some time in the early morning of December 2.

The jurors are the judges of the credibility of the witnesses, and they were authorized to find that the defendant had not established his defense of alibi and overcome the evidence of the State as to his guilt. *Stiles v. State,* 113 Ga. 700 (39 SE 295); *Porter v. State,* 200 Ga. 246, 254 (36 SE2d 794).

The evidence was sufficient to support the verdict, and it was not error to deny the motion for new trial.

*Judgment affirmed. All the Justices concur.*